IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs August 21, 2007

## LEROINE MARTIN v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Knox County**
**No. 80086   Mary Beth Leibowitz, Judge**

---

**No. E2006-02280-CCA-R3-PC** - Filed September 28, 2007

---

The Petitioner, Leroine Martin, pled guilty to two counts of second degree murder and one count of aggravated robbery. He filed a petition for post-conviction relief alleging that he received the ineffective assistance of counsel prior to and during the guilty plea proceedings. The post-conviction court denied his petition. After a thorough review of the record and applicable law, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and THOMAS T. WOODALL, JJ., joined.

Leslie M. Jeffress, Knoxville, Tennessee, for the Appellant, Leroine Martin.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Randall E. Nichols, District Attorney General; Leslie Nassios, Assistant District Attorney General, for the Appellee, State of Tennessee.

## OPINION

### I. Facts

On February 27, 2004, the Petitioner pled guilty to two counts of second degree murder and one count of aggravated robbery.[1] At the guilty plea submission hearing, the State provided the

---

[1] The Petitioner was originally charged in: (1) a multi-count indictment of first degree murder, felony murder, and especially aggravated robbery; (2) a theft and vandalism indictment; and (3) a one-count indictment of aggravated robbery. As part of his plea, the Petitioner pled guilty to two counts of the lesser-included offense of second degree murder, and the State dismissed the theft and vandalism indictment. The Petitioner also pled guilty to the one-count

following facts as the basis for the Petitioner's plea for the two counts of second degree murder:

[O]n the 24th day of February, 1999, [the Petitioner] was accompanied by Tina Michelle Summers and Johnny Richard Young, they had been smoking crack that night together. Ms. Tina Summers had a vehicle and [the Petitioner] requested a ride to go over to the Ridge Brook Complex where he knew he could get some crack cocaine. [The Petitioner] along with Ms. Summers and Mr. Young rode over to the complex. Mr. Young would testify that [the Petitioner] exited the vehicle, that [the Petitioner] did not have any money on him, that [the Petitioner] had a weapon on him, a pistol on him, that he exited the vehicle and that he went up into the Ridge Brook Apartment complex. Mr. Young would further testify that he heard gunshots and [the Petitioner] came back to the car, and when [the Petitioner] came back he told Mr. Young that he faked Tyshawn Hardin out, that he pretended that he was going to buy crack cocaine from him and stuck his hand in his pocket and instead of pulling out money he pulled out the gun and shot Tyshawn Hardin and took six rocks of crack cocaine. He would further testify that [the Petitioner] told him that James Williams had run upon him and he had shot him too.

Subsequent to that – subsequent to the deaths of Mr. Williams and Mr. Hardin a Knoxville Police Department Officer, Benny French, interviewed the [Petitioner]. The [Petitioner] gave a version admitting that he was in fact there at the crime scene. Admitting that he in fact had shot and killed Tyshawn Hardin, and admitting that he had in fact shot and killed James Williams, but he said rather that it was in his self defense. And Johnny Richard Young would testify to the contrary based on his observations and the statement from the [Petitioner] after.

Additionally, the State provided the following facts as the basis for the Petitioner's plea to aggravated robbery:

Derrick Jackson was at home at his residence when he heard – when he and his fiancé were asleep at 2:03 – between two and 3:00 in the morning, heard a knock at the door, and his fiancé answered. And the [Petitioner] who he knew, Leroine Martin, came in and asked to borrow money. The victim Derrick Jackson refused. The [Petitioner] then fired off a shot and demanded money at which point the victim handed him $400.00 from his pocket.

Pursuant to the plea agreement, the trial court sentenced the Petitioner to thirty years in prison.

The Petitioner filed a pro se petition for post-conviction relief, later amended by appointed counsel, claiming ineffective assistance of counsel prior to and during the guilty plea proceedings.

---

indictment for aggravated robbery.

At the hearing on the Petitioner's petition for post-conviction relief, the following evidence was presented: the Petitioner testified that approximately two days before his guilty plea, his trial counsel ("Counsel") told him that, if he did not plead guilty to second-degree murder and aggravated robbery, he would receive two life sentences plus ten years. The Petitioner also said that Counsel came to him with an offer of twenty-five years total for all counts, with an eighty-five percent release eligibility. The Petitioner told Counsel that he would only accept twenty years total. The Petitioner further testified that he was unaware that he would receive thirty years total until the trial court announced it at the guilty plea submission hearing.[2] The Petitioner claimed that the only thing that registered with him at that hearing was that if he did not "go along" with what Counsel told him, then he would get a much harsher sentence. The Petitioner also said that he was "ignorant to the law at the time" and that Counsel "screwed him royally" by adding five extra years to the original plea offer. The Petitioner further testified that he had thought about his guilty plea before be took it but stated that "it was too late" to contest. Additionally, the Petitioner said that Counsel never told him that he could stop the guilty plea proceedings at any time. The Petitioner also asserted that he was "not happy with . . . 30 years because . . . I wasn't intending to kill [any]body" and his "life was in danger as well."

The Petitioner further testified that Counsel "wasn't ready for trial" and "was just going through the motions." He said that Counsel showed him autopsy pictures but never gave him discovery. When asked what motions Counsel filed on his behalf, the Petitioner stated: "[H]e filed . . . for me to see doctors, and he filed suppression hearing motions . . . . But the work was done on the back of his old bank statement[s]. . . . That's just really unprofessional." The Petitioner also said that most of the time when Counsel came to see him in jail, the Petitioner argued with, cursed at, and spat at him. The Petitioner was adamant that Counsel should have removed himself from his case.

The Petitioner further testified that Counsel had explained to him that he had the right to remain silent and the right to have a trial. The Petitioner also said that he knew that Counsel had hired an investigator to work on his case. The investigator would sometimes visit the Petitioner in jail alone and would sometimes accompany Counsel. The Petitioner stated that either Counsel or the investigator had interviewed Tina Summers and Johnny Young as witnesses and that Counsel explained to him to what they would have testified had his case been tried. The Petitioner also stated that he could not think of any additional witnesses he wished Counsel had interviewed.

The Petitioner further testified that he was taking Paxil, a psychotropic medication, at the time that he pled guilty. He stated that because he has low serotonin levels in his brain, he sometimes has to take Paxil to level them out. The Petitioner also acknowledged that Counsel, under the direction of a doctor, had him tested for low serotonin levels. The Petitioner stated, however, that he was not taking any kind of medication for most of the time that he spent in jail prior to his

---

[2] The Petitioner gave inconsistent testimony regarding when he first heard about the thirty-year plea offer. At one point he stated that he first heard about it during the submission hearing. At another point, however, he stated that "when I told [Counsel] to go get the 20 and [Counsel] *came back with the 30*, I was under the impression that I got the 20." (Emphasis added).

port-conviction hearing.

The Petitioner testified that "[Counsel] wasn't ready for . . . trial." The Petitioner stated that Counsel did not discuss with him any possible defenses to the charges. He then continued to reiterate that Counsel failed to talk to him about evidence that the State had acquired. The Petitioner said that he did not understand why he was charged with felony murder but that Counsel explained felony murder to him. The Petitioner also said that he did not ask Counsel any other questions about the indictment or presentment because the Petitioner just wanted him to "get off my case."

On cross-examination, the Petitioner testified that, if the post-conviction court granted his petition, he understood that he would get to go through "the whole process over again." He also said that he would more than likely win a new suppression hearing and obtain "some serious relief" because "the [e]vidence is gone." He stated that the State could not have all the evidence because "the detective . . . [doesn't] know if he has the original warrant or computer generated warrant." He added that, when noting that the evidence was gone, he was referring to "the gun, the warrant, [and] all of that old nonsense." The Petitioner further testified that the State's witnesses, Summers and Young, would not pose a threat to his case because "a good lawyer is going to kill their credibility because they ain't nothing but junkies, and they got a rap sheet way longer than mine." The Petitioner also refused to "suppose" what would happen if the court granted him a new trial. He did state, however, that he understood if he had a jury trial on his charges he could be convicted of double homicide and aggravated robbery, and receive two life sentences plus ten years.

The Petitioner further testified that the judge at the guilty plea submission hearing probably went over all of his constitutional rights, but he ultimately "can't remember if she did or didn't." The Petitioner then agreed to allow the State to read parts of the transcript from that hearing in order to refresh his memory about what transpired. After the State read each segment, the Petitioner kept responding: "You got the paper." The Petitioner also admitted that, even though he remembered being present at the hearing, "I wasn't really listening to [any] of [it]." When the Petitioner insisted that he did not remember the court making some of the statements in the transcript, he eventually acquiesced by stating that "[i]f it's on the paper she evidently said it." He also said later in the hearing that "it's all coming back to me now."[3]

The Petitioner further testified that he has "an extensive rap sheet of fleeing and possession and attempting to go armed" and that he "might have got one or two assaults in there." He stated, however, that this "[does not] stop the fact that I'm entitled to adequate counsel." The Petitioner also stated that Counsel "coerced" him into pleading guilty. When asked what he meant by "coerced," the Petitioner stated that coercion means persuasion and that "[Counsel] persuaded me to take a plea that I'm not happy with." The Petitioner also said that Counsel "took advantage of [the Petitioner's]

---

[3]At this point in the post-conviction hearing, the State recounted, in detail, the exchange between the court and the Petitioner at the guilty plea submission hearing in order to illicit whether or not the Petitioner remembered it. Because much of this exchange is not directly related to the Petitioner's ineffective assistance of counsel claim, which is what we are addressing on appeal, we will not summarize it here.

mental state at the time" because the Petitioner "[didn't] know about the law and [was] taking medication." Additionally, the Petitioner maintained that he "didn't kill two people" and that "what the witnesses said don't amount to [anything]" because they are "junkies." The Petitioner was adamant that he would not have to spend a lot of time, if any, in jail if he were to receive a new trial.

The Petitioner further testified that he was unaware that Counsel filed a number of motions on his behalf. He was also unaware that Counsel filed a notice of Counsel's intention to rely upon a defense concerning the Petitioner's low serotonin levels should the Petitioner's case go to trial. The Petitioner stated that he remembered seeing several doctors, including Drs. Pamela Auble and Keith Caruso. He also remembered that Dr. Paul Rosby was the serotonin expert who "probably" reviewed his medical records at Counsel's request. The Petitioner contended that in hiring these doctors to evaluate him, Counsel was "doing nothing but . . . getting money" and procrastinating. The Petitioner also stated that he remembered discussing with Counsel his potential defense regarding his low serotonin levels. Counsel told the Petitioner that "it wasn't going to work" and that "you need to take [the guilty] plea."

The Petitioner testified that Counsel only met with him three times over the course of four years. When the State commented that "[s]everal means more than three," the Petitioner changed his testimony and stated that Counsel met with him about fifteen times over the course of four years. The Petitioner said that he was not cooperative during any of those meetings because he wanted Counsel to get off the case. He also said that the attorney on his case prior to Counsel was removed from the case because the Petitioner could not get along with him and that his post-conviction counsel should also be removed because he had no confidence in his ability to represent the Petitioner. When asked what Counsel should have done differently throughout the course of his representation, the Petitioner stated: "He should have conducted himself in a more professional manner. He should have got[ten] off my case when I asked him to get off my case. That would have been the appropriate and ethical thing to do."

Counsel testified that he was appointed to represent the Petitioner on August 3, 2000, after previous counsel had withdrawn from the case. He stated that he prepared the motions that were present in the court file and that, over the course of his representation, he met with the Petitioner in the jail about seventy-five to eighty times. He stated that this "[did not] include court conversations, telephone conversations, or anything like that" and that, if those were included, the number would increase to over one hundred contacts. Counsel said: "Some of these meetings were not pleasant. But they weren't quite to the point of what [the Petitioner] described. . . . [M]ost of the time he would [calm down] and we could communicate."

Counsel further testified that he had some problems obtaining discovery at first, but "everything [eventually] came together." He stated that he went over everything he had with the Petitioner and provided him with copies of witness statements, all the motions filed, and police reports. Counsel also stated that it was fair to say that the State's witnesses would have testified at trial that the Petitioner committed and admitted to the charged offenses. The only witness that Counsel was initially concerned about was Johnny Young. As a result, Counsel and the investigator

on the case traveled to Clifton, Tennessee to speak with Young. After losing contact with Young for some time, Counsel traveled to Renfro Valley, Kentucky to meet with him again, and he recorded Young's testimony. Counsel stated that, were this testimony to come in during trial, it would be devastating for the Petitioner. He also stated that the trial court had previously denied his motion to suppress the Petitioner's statement admitting to the shooting, so the statement would definitely come into evidence during trial. Counsel said that, after evaluating the State's case, he thought that there was a great risk that the Petitioner would be convicted at trial for first degree murder and felony murder.

Counsel further testified that the Petitioner had a very bad childhood and was in juvenile detention for most of his life growing up. He stated that after consulting Drs. Auble and Caruso, "[t]hey both felt like [the Petitioner] had conduct disorder, aggressive type behavior, [and] developmental disorder." Dr. Auble also diagnosed the Petitioner with Post Traumatic Stress Syndrome. Counsel stated that none of these disorders would qualify for an insanity defense. However, the doctors recognized that the Petitioner could have a condition involving low serotonin levels, so Counsel had two doctors from Nashville come in and draw cerebral spinal fluid from the Petitioner. Counsel explained that the Petitioner's serotonin levels were "abnormally low." He also explained that he discussed the potential use of this defense with another attorney in Memphis. He spoke to him on the phone several times, traveled to Memphis, and looked at some of his files, which included a transcript of Dr. Rosby's expert testimony on serotonin from another case. Counsel also stated that he twice went to Jackson, Tennessee, to review the entire file from a death penalty case in order to determine if this particular defense was viable.

Counsel further testified that on February 24, 2004, three days before the guilty plea submission hearing, he met with Young in Renfro Valley, recorded Young's statement, and immediately went to see the Petitioner to play the tape of Young's statement and to "discuss[ ] all aspects of the . . . plea agreement with him." Counsel stated that he and the Petitioner discussed a possible plea agreement prior to February 24th. Counsel also stated that he received the State's firm offer for a plea agreement on February 25th, and he took the agreement to the Petitioner and told him to "go through it all" and to contact him if he had any questions. When asked to respond to the Petitioner's allegations that he did not understand the plea agreement and that Counsel did not explain to him that the State would have to prove every element of the charged offenses beyond a reasonable doubt, Counsel stated that "[the Petitioner] knew what we were looking at, and I had explained all of this to him [for] over three years." He also said that there was "[n]o question" that the Petitioner knew that he had a right to a jury trial, understood the serotonin defense, and understood the plea agreement. Counsel also testified that he discussed with the Petitioner his privilege against self incrimination and that the Petitioner understood that discussion.

Counsel further testified that "the whole case just about turned on the testimony . . . of Dr. Auble, Dr. Caruso, and Dr. Paul Rosby on the serotonin issue." He explained to the Petitioner that "the best anybody has ever done with this type of defense is second degree [murder]" and that "there's . . . a very good likelihood that you would be found guilty of at least one of [the first degree murder counts] . . . ." He also explained to the Petitioner that the evidence on the serotonin issue

could be excluded at trial and only used as mitigation evidence at a sentencing hearing.

On cross-examination, Counsel testified that he and the Petitioner had "many successful meetings." He stated that the investigator accompanied him at least eleven times and that the Petitioner's girlfriend accompanied him many other times. Counsel also said that when he met with the Petitioner on February 24th and explained to him to what he thought that Young would testify at trial, the Petitioner "got more serious about making a deal." When asked whether the Petitioner was lucid at the time of this conversation, Counsel responded: "Probably better than any time since I've known him." Counsel also stated that he brought a "standard plea agreement" with the thirty-year sentence down to the Petitioner to sign on February 25th, and the Petitioner entered the plea at the submission hearing two days later. Counsel stated that "it's ridiculous" for the Petitioner to claim that he knew nothing about the thirty-year offer until the court told him about it at the submission hearing. The Petitioner "was pleased to get the 30 year offer" and "knew what a 30 year plea was." Counsel also said that he told the Petitioner that, if he were to be convicted of first degree murder, one of the issues on appeal could be the findings at the suppression hearing. The Petitioner stated that he did not want to go to trial.

Counsel further testified that, out of the seventy-five to eighty meetings with the Petitioner, "[there were] maybe one or two meetings . . . where we just got to the point where [the Petitioner] wouldn't talk." He also said that he did not remember any meetings being violent or confrontational. He stated that he made copies of everything and brought it down to the Petitioner. Counsel also said that he was aware that the Petitioner could not read very well but insisted that "[the Petitioner] knew how to take things out of police reports and witness statements" because the Petitioner "point[ed] out things in there that I might have overlooked at certain times." Counsel reiterated that he explained to the Petitioner what the State would have had to prove in order to convict and went through the entire plea agreement with him. Counsel said that the Petitioner "knew what he was giving up when he entered the plea."

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief in a written order. It is from this order that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner claims that Counsel was ineffective by: (1) failing to fully explain the plea agreement to the Petitioner; (2) failing to consider the Petitioner's medical history or that the Petitioner was taking a psychotropic medication at the time of the plea; (3) failing to properly advise the Petitioner about the State's obligation to prove every element of the charged offenses beyond a reasonable doubt, his right against self-incrimination, and his right to a jury trial; (4) failing to interview potential witnesses, prepare a defense, or discuss with the Petitioner possible defenses; and (5) coercing the Petitioner to plead guilty and accept the sentence offered.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103

(2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994). As to guilty pleas, the petitioner must establish that, but for counsel's errors, the petitioner would not have entered the plea and would have insisted on proceeding to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

## A. Failure to Fully Explain Plea Agreement

The Petitioner argues that Counsel failed to fully explain the plea agreement to him, including the amount of time he would serve pursuant to the agreement. The State contends that there is evidence in the record to prove not only that Counsel carefully went through the agreement with the Petitioner but that the Petitioner fully understood it as a result. We agree with the State. The post-conviction court found that "[i]t appears . . . that [the Petitioner] was lucid and understanding at the time of the plea, that he fully understood the agreement which he received, that he has shown that he received a better deal upon renegotiations with [the State], that [Counsel] . . . served [the Petitioner] and his interest well." As stated above, Counsel went over the plea agreement with the Petitioner, and the trial court ensured during the guilty plea hearing that the Petitioner understood the plea agreement. While the Petitioner now maintains that he did not understand the agreement, the post-conviction court rejected that contention. We presume that the post-conviction court's factual findings are correct absent a preponderance of the evidence suggesting otherwise. *See Fields*, 40 S.W.3d at 456-57. We conclude that Counsel was not deficient in this regard.

## B. Failure to Consider Medical Issues

The Petitioner next claims that, when negotiating the plea agreement with the State, Counsel failed to consider the Petitioner's medical history and usage of Paxil. Counsel testified that he had directed Drs. Auble and Caruso to evaluate the Petitioner's mental state, and after consulting with them on their findings, he determined that none of the Petitioner's medical disorders would qualify for an insanity defense at trial. Counsel also testified that he directed two doctors to come in from Nashville to conduct a spinal tap on the Petitioner, which would test for low levels of serotonin. The Petitioner testified that Dr. Rosby, the serotonin expert, likely reviewed his medical records at Counsel's request. In addition, the Petitioner remembered Counsel discussing a possible defense with him regarding his low serotonin levels. As stated above, we must defer to an attorney's professional judgment if it is informed and based upon adequate preparation. *See House*, 44 S.W.3d at 515. In this case, Counsel gathered medical evidence and contemplated this potential defense before ultimately recommending that a plea agreement would be the best result for the Petitioner. We conclude that Counsel was not deficient in this regard.

### C. Failure to Properly Advise

The Petitioner next contends that Counsel failed to properly advise the Petitioner regarding the State's obligation to prove every element of the charged offenses beyond a reasonable doubt, the Petitioner's right against self-incrimination, and his right to a jury trial. Counsel testified that he had explained to the Petitioner exactly what the State would have to prove in order to convict, that the Petitioner had a privilege against self-incrimination, and that he had a right to have a jury trial. The Petitioner testified that he knew that a jury could have convicted him and that he could have received two life sentences plus ten years. Counsel also testified that, after discussing all the testimony and evidence with the Petitioner, the Petitioner stated that he would rather accept a plea agreement than go to trial. The Petitioner has not proven by clear and convincing evidence that Counsel was deficient. The Petitioner is not entitled to relief on this issue.

### D. Failure to Prepare

Next, the Petitioner asserts that Counsel was ineffective because he failed to interview potential witnesses, prepare a defense, or discuss possible defenses with him. The Petitioner testified that either Counsel or the investigator interviewed both Johnny Young and Tina Summers and explained to him to what they would have testified at trial. Counsel testified that he traveled to two different places to interview Young and record his statement. We have already noted that Counsel prepared for a defense concerning the Petitioner's low serotonin levels, and he discussed it with the Petitioner. Additionally, the post-conviction court found that "[Counsel] went far over and above in order to build defenses for [the Petitioner]." Thus, we conclude that Counsel was not deficient in this regard. Also, the Petitioner has not identified any witness that Counsel should have interviewed or defenses that Counsel should have presented. Accordingly, the Petitioner also failed to prove any prejudice.

### E. Coercion

Finally, the Petitioner contends that Counsel was ineffective by coercing him to plead guilty and accept the thirty-year sentence. Specifically, the Petitioner argues that Counsel assured him that he would be convicted of first degree murder and sentenced to life in prison if he were to go trial, so the Petitioner was frightened into accepting the plea offer. The Petitioner testified that, to him, coercion means the same thing as persuasion. Thus, in effect, he claims that Counsel *persuaded* him to plead guilty and accept the sentence. Given the facts of this case and the clear evidence against the Petitioner, it was not objectively unreasonable for Counsel to give a professional recommendation that the Petitioner plead guilty and accept the sentence. As stated above, we must view an attorney's conduct as falling within a wide range of reasonable professional assistance. *See Burns*, 6 S.W.3d at 462. Thus, the Petitioner is not entitled to relief.

### III. Conclusion

Based on the foregoing reasoning and authority, we conclude the Petitioner has not proven by clear and convincing evidence that he received the ineffective assistance of counsel. As such, we affirm the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE